**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **PAXTON ALLEN, DAVID DUNN,** | ) | |
| **SCOTT MEREDITH, RAMON BANEY,** | ) | |
| **NICOLE HENAIRE, INDIVIDUALLY AND** | ) | |
| **AS REPRESENTATIVES OF** | ) | |
| **ALL THOSE SIMILARLY SITUATED** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| ***v.*** | ) | **Case No. _____** |
| | ) | |
| **NORTHROP GRUMMAN, AECOM** | ) | |
| **GENERAL DYNAMICS, AND** | ) | |
| **RAYTHEON COMPANY** | ) | |
| | ) | |
| **Defendants** | ) | |

**CLASS ACTION ORIGINAL COMPLAINT**

Plaintiffs Paxton Allen, David Dunn, Scott Meredith, Ramon Baney, and Nicole Henaire (hereinafter "Plaintiffs") file this lawsuit individually and as representatives of all those similarly situated, and represent as follows:

**JURISDICTION AND VENUE**

1.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

2.    This is a suit arising under Federal Law and is a claim for civil damages based on violations of 26 U.S.C. § 6103 and common law fraud. A civil action for remedy of such damages is authorized under 26 U.S.C. § 7431.

3.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1).

4.    The sum sought to be recovered is the full extent of damages available under the

applicable statues for each taxpayer including attorney's fees for bringing and pursuing this action. This sum cannot be fully determined until discovery has been conducted to determine the full extent of the § 6103 violations.

## PARTIES

5.    Plaintiff, Paxton Allen, is an individual who is a United States citizen and taxpayer. He may be served with process by serving his attorney of record, Castro & Co., LLC, at their Dallas office located at 13155 Noel Road, Ste. 900, Dallas, Texas 75240.

6.    Plaintiff, David Dunn, is an individual who is a United States citizen and taxpayer. He may be served with process by serving his attorney of record, Castro & Co., LLC, at their Dallas office located at 13155 Noel Road, Ste. 900, Dallas, Texas 75240.

7.    Plaintiff, Scott Meredith, is an individual who is a United States citizen and taxpayer. He may be served with process by serving his attorney of record, Castro & Co., LLC, at their Dallas office located at 13155 Noel Road, Ste. 900, Dallas, Texas 75240.

8.    Plaintiff, Ramon Baney, is an individual who is a United States citizen and taxpayer. He may be served with process by serving his attorney of record, Castro & Co., LLC, at their Dallas office located at 13155 Noel Road, Ste. 900, Dallas, Texas 75240.

9.    Plaintiff, Nicole Henaire, is an individual who is a United States citizen and taxpayer. He may be served with process by serving his attorney of record, Castro & Co., LLC, at their Dallas office located at 13155 Noel Road, Ste. 900, Dallas, Texas 75240.

10.    The Class Members are all persons, regardless of specific employer, who worked for Defendants at the Joint Defense Facility Pine Gap in Alice Springs, Northern Territory, Australia during the three-year period immediately preceding the filing of this Complaint.

11.    Defendant, Northrop Grumman, is a Virginia corporation with substantial contacts in

this judicial district. Northrop Grumman may be served with process by serving their registered agent CT Corporations at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

12. Defendant, Raytheon Company, is a Delaware corporation with substantial contacts in Dallas, Texas. Raytheon Company may be served with process by serving their registered agent CT Corporations at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

13. Defendant, AECOM, is a California corporation with substantial contacts in this judicial district. AECOM may be served with process by serving their registered agent CT Corporations at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

14. Defendant, General Dynamics, is a Virginia corporation with substantial contacts in this judicial district. General Dynamics may be served with process by serving their registered agent CT Corporations at 1999 Bryan Street, Ste. 900, Dallas, Texas 75201.

## RELEVANT STATUTES AND INTERNATIONAL AGREEMENTS

15. Congress enacted 26 U.S.C. ("Internal Revenue Code") § 6103 with the Tax Reform Act of 1976 with the intention of protecting taxpayers from unauthorized disclosure of their tax return information with past political abuses being their primary motivation.  Tax returns and tax return information were prescribed by the Internal Revenue Code to be legally confidential to the degree of sanctity.  Certain persons, who, through their employment, might gain access to return information are specifically directed not to make disclosures, including federal government employees, state workers, and those involved in agencies, such as the one administering the food stamp program.[1]

16. Logically, returns and return information may be disclosed, without written request, to *Treasury* officers and employees whose official duties require such inspection or disclosure for

---

[1] *See* 26 U.S.C. ("I.R.C.") § 6103(a)(3).

tax administration purposes.[2]

17.    Taxpayers can voluntarily designate to a limited set of *specified* persons to whom their return may be disclosed.[3]  Internal Revenue Code section   ("Section") 6103(e) provides for disclosure to a specific set of persons who are considered to have a material interest in the return. These include spouses, children, members of business entities such as partners and shareholders, trust and estate beneficiaries, representatives of deceased taxpayers, along with receivers, and bankruptcy trustees.[4]  Taxpayers can also designate an attorney to inspect and view their return.[5] An employer is *never* permitted to receive return information.

18.    On December 9, 1966, the U.S. entered into the *Agreement Between the Government of the Commonwealth of Australia and the Government of the United States of America Relating to the Establishment of a Joint Defense Space Research Facility* (herein, "1966 JDFPG Defense Treaty").

19.    It is a general rule of international tax law that wages and salaries are sourced to the geographic area of physical performance, and the country with legal jurisdiction over that geographic area will have primary taxing rights over the income.[6]

20.    Because the U.S. government did not want Americans working at JDFPG exposed to Australian taxation, the 1966 JDFPG Defense Treaty, Article 9, Paragraph 1, clarified that "[i]ncome derived wholly and exclusively from performance in Australia of any contract with the United States Government in connection with the facility by any person… who is in or is carrying on business in Australia solely for the purpose of such performance, shall be deemed not to have been derived in

---

[2] 26 U.S.C. § 6103(h)(1).
[3] 26 U.S.C. § 6103(c); 26 C.F.R. § 301.6103(c)-1.
[4] 26 U.S.C. § 6103(e).
[5] 26 U.S.C. § 6103(e)(6).
[6] *See* John Anthony Castro, *International Taxation in Plain English* 183 (Tiffany Michelle Hunt, 1st ed. 2018).

Australia, provided that it is not exempt, and is brought to tax, under the taxation laws of the United States." In other words, although salaries of JDFPG employees are earned in Australia, they would not be subject to Australian taxation as long as the salaries were not exempt and being taxed in the United States.

21. Income tax treaties were not yet prevalent in the 1960s.[7] Bilateral income tax treaties did not become the norm until the 1980s. Thus, it was necessary for the 1966 JDFPG Defense Treaty to specifically address the tax matter of JDFPG salaries.

22. Section 911 of the Internal Revenue Code (herein, "Section 911") allows U.S. taxpayers working overseas to exclude the first $105,900 of earned income; however, any salaries in excess of that amount are subject to U.S. federal income tax.

23. Therefore, because the 1966 JDFPG Defense Treaty requires the salaries of Americans to be brought to tax in the United States in order to be exempt from tax in Australia, it was the perception of most parties that Americans working at JDFPG were unable to claim the Section 911 *Foreign Earned Income Exclusion*.

24. On October 18, 1983, the U.S. entered into the *Convention Between the Government of the United States of America and the Government of Australia for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income* (herein "U.S.-Australia Income Tax Treaty").

25. The 1983 U.S.-Australia Income Tax Treaty, Article 19, holds that wages of employees of private defense contractors in Australia are exclusively taxable in the U.S.[8]

---

[7] Internal Revenue Service, *Table 3. List of Tax Treaties* (October 31, 2015), https://www.irs.gov/pub/irs-utl/Tax_Treaty_Table_3.pdf (last visited January 28, 2019).
[8] *See* John Anthony Castro, *Tax Treatment for American Contractors Employed at the Joint Defense Facility at Pine Gap (JDFPG)*, Castro & Co. International Tax Blog (Dec. 20, 2018), https://www.castroandco.com/blog/2018/december/tax-treatment-for-american-contractors-employed-/.

26.    Income tax treaties specifically resolve income tax matters, and the income tax treaties with several countries, including, but not limited to, the United Kingdom,[9] Italy,[10] Korea,[11] Japan,[12] Germany,[13] Belgium,[14] and Australia all specifically address the U.S. federal income tax treatment of employees of defense contractors working in those respective countries for the benefit of the U.S. government.[15]

27.    To summarize, it was the misperception of some that the 1966 JDFPG Defense Treaty says you must forego the Section 911 Foreign Earned Income Exclusion to avoid Australian taxation; while the 1983 Income Tax Treaty says the U.S. has exclusive taxing rights, which implicitly permits JDFPG employees to claim the Section 911 Foreign Earned Income Exclusion.  Therefore, a conflict exists between two treaties.

[9] The Technical Explanations to Article 19, Paragraph 1, of the U.S.-U.K. Income Tax Treaty states "This paragraph follows the OECD Model, but differs from the U.S. Model in applying only to government employees and not to independent contractors engaged by governments to perform services for them." The U.S.-U.K. Income Tax Treaty specifically excludes employees of private contractors from the "government service" article.

[10] On the other hand, the Technical Explanations to Article 19, Paragraph 1, of the U.S.-Italy Income Tax Treaty states "Unlike the OECD Model, the paragraph applies both to government employees and to independent contractors engaged by governments to perform services for them." The U.S.-Italy Income Tax Treaty specifically includes employees of private contractors in the "government service" article.

[11] The Technical Explanations to Article 22 of the U.S.-Korea Income Tax Treaty states "Under this article, wages, salaries, and similar remuneration, including pensions or similar benefits, paid from public funds of one Contracting State to a citizen of that Contracting State for labor or personal services performed as an employee of that Contracting State or instrumentality thereof in the discharge of governmental functions will be exempt from tax by the other Contracting State." The U.S.-Korea Income Tax Treaty extends to instrumentalities of the state performing governmental functions. The use of the term "governmental functions" could possibly imply non-government employees performing functions of a governmental nature. Nevertheless, the use of the phrase "paid from public funds" appears to require payment directly from the government, which would presumably exclude employees of private contractors. This could reasonably be rebutted with the fact that the principal-agent relationship between the U.S. government and defense contractors could qualify as an indirect payment from public funds.

[12] The Technical Explanations to Article 18, Paragraph 1, of the U.S.-Japan Income Tax Treaty states "This paragraph follows the OECD Model, but differs from the U.S. Model in applying only to government employees and not to independent contractors engaged by governments to perform services for them." The U.S.-Japan Income Tax Treaty specifically excludes employees of private contractors in the "government service" article.

[13] The Technical Explanations to Article 19, Paragraph 1, of the U.S.-Germany Income Tax Treaty states "Article 19 of the Convention includes payments in respect of services rendered in connection with a business carried on by the governmental entity paying the compensation or pension." The U.S.-Germany Income Tax Treaty specifically includes employees of private contractors in the "government service" article.

[14] The Technical Explanations to Article 18, Paragraph 1, of the U.S.-Belgium Income Tax Treaty states "The paragraph applies to anyone performing services for a government, whether as a government employee, an independent contractor, or an employee of an independent contractor." The U.S.-Belgium Income Tax Treaty specifically includes employees of private contractors in the "government service" article.

[15] All of these examples of income tax treaties specifically addressing whether employees of private contractors are covered by the income tax treaty article on government service wages is intended to dispel the oft-repeated myth that income tax treaties do not address this topic. The income tax treaties with the United Kingdom, Italy, Korea, Japan, Germany, Belgium, and Australia all specifically address the topic. On that basis, the U.S.-Australia Income Tax Treaty is both more specific and last-in-time; hence, it controls.

28.     In 2003, the United States Court of Appeals for the D.C. Circuit, while interpreting the intent of Congress in enacting Section 7852(d)(1), adopted the later-in-time rule with regard to interpretation of federal law between statutes enacted by Congress and treaties entered into by the United States.[16]  The same logic applies to conflicts between two treaties.

29.     Because treaties and acts of Congress are given equal weight by the Constitution as domestic law, Congress has the authority to overrule the effect of a treaty by subsequent legislation. When an act of Congress and a treaty relate to the same subject, the courts will endeavor to construe them so as to give effect to both, if that can be done without violating the language of either.[17]

30.     Based on equal legal status of treaties and statutes, the courts have enunciated a general rule of interpretation for resolving conflicts between treaty provisions and other provisions of federal law.[18]  This rule of interpretation, however, operates only in the absence of express congressional direction to the contrary.  If a new treaty provision conflicts with an older treaty provision, the U.S. Supreme Court has held that the one adopted last in time generally prevails.[19]

31.     With regard to determining the "timing" of a federal statute or international treaty's enactment, interpretative guidance, regulations, extensions, and even amending protocols are *all*

---

[16] *See Kappus v. C.I.R.*, 337 F.3d 1053, 1057 (D.C. Cir. 2003) (citing S. Rep. No. 100-445, at 316-28 (1988).

[17] *See Pekar v. C.I.R.*, 113 T.C. 158 (1999) (court held that former Section 59(a)(2) was in harmony with the double taxation provisions of Article 23 of the U.S. tax treaties with Germany and the United Kingdom); *Brooke v. C.I.R.*, T.C. Memo 2000-194 (2000) (court held that former version of Section 59 could be read in harmony with the double taxation prohibition in Article 23 of the U.S. tax treaty with Germany, because the treaty provides that the double taxation clause is "subject to the limitations of the law of the United States"), *aff'd sub nom.* 13 F. App'x 7 (D.C. Cir. 2001); *Kappus v. C.I.R.*, T.C. Memo. 2002-36 (2002) (Tax Court held that former Section 59(a)(2) did not conflict with the double taxation provisions of Article 24 of the U.S. tax treaty with Canada), aff'd, 337 F3d 1053 (DC Cir. 2003) (court of appeals held that former Section 59(a)(2) prevailed over the Canadian treaty because it was the later in time; court did not resolve issue of whether the pre-existing treaty was in harmony with former Section 59(a)(2)); *Price v. C.I.R.*, T.C. Memo. 2002-215 (2002) (Tax Court held that former Section 59(a)(2) could be read as harmonious with the U.S. tax treaty with Canada); *Vax v. C.I.R.*, T.C. Memo. 2005-134 (2005) (Tax Court held that former Section 59(a)(2) could be read in harmony with the U.S. tax treaty with the Czech Republic); *Haver v. C.I.R.*, T.C. Memo. 2005-137 (2005), *aff'd*, 444 F.3d 656 (DC Cir. 2006) (Tax Court and court of appeals held that former Section 59(a)(2) could be read in harmony with the U.S. tax treaty with Germany).

[18] *See* John Anthony Castro, *International Taxation in Plain English* 183 (Tiffany Michelle Hunt, 1st ed. 2018).

[19] *See Whitney v. Robertson*, 124 U.S. 190 (1888).; *also see, e.g.*, *Menominee Tribe of Indians v. U.S.*, 391 US 404, 412–413 (1967) (Termination Act did not abrogate hunting and fishing rights granted Indians by treaty; court refused to find that Act abrogated treaty rights without finding "explicit statement" to that effect); *Cook v. U.S.*, 288 US 102, 120 (1933) (later inconsistent legislation did not supersede pre-existing treaty provision because neither committee report nor debates on legislation mentioned treaty provision).

disregarded since they all relate-back to the original enactment or entry into force.[20]

32.    In light of these rulings from the U.S. Supreme Court and the United States Court of Appeals for the D.C. Circuit, it became clear to the international tax community that the U.S.-Australia Income Tax Treaty superseded the tax provisions of the 1966 JDFPG Defense Treaty, which now allows employees at JDFPG to claim the Section 911 *Foreign Earned Income Exclusion*.

## BACKGROUND

33.    On August 11, 2017, Plaintiff Scott Meredith contacted Castro & Co. through their website to request assistance with this tax matter.

34.    Plaintiff Scott Meredith believed that he was lawfully entitled to claim the Section 911 *Foreign Earned Income Exclusion*, but his employer and other companies at JDFPG advised that his interpretation was legally incorrect; despite his employment contract stating that the employer would not provide legal or tax advice.

35.    On August 24 and August 25, 2017, Northrop Grumman held an overview of international taxation of U.S. expatriates, in which Plaintiffs and Class Members were consistently told that if they took the Section 911 Foreign Earned Income Exclusion, they would be taxed to the fullest degree.

36.    JDFPG officials also advised that claiming the exclusion was inappropriate.  They explained that the Section 911 *Foreign Earned Income Exclusion* had been impermissible for over 50 years.  They threatened to terminate the employment of anyone that claimed the Section 911 *Foreign Earned Income Exclusion*.

37.    On or around February 2018, during the course of several consultations with Plaintiff Scott Meredith and other employees at JDFPG, Castro & Co. learned that IRS Employee Melanie

---

[20] *See Kappus v. C.I.R.*, 337 F.3d 1053, 1057 (D.C. Cir. 2003); a*lso see Nat'l Westminster Bank v. U.S.*, 512 F.3d 1347 (Fed. Cir. 2008) (if a new regulation is inconsistent with a treaty's purpose and intent, the regulation is invalid as a matter of law).

Godelis had unlawfully shared legally confidential taxpayer information of certain employees that had claimed Section 911 *Foreign Earned Income Exclusion* on their tax returns, with several Human Resources Directors of various defense contracting companies at JDFPG, including, but not limited to, Raytheon HR Director Elizabeth Montilla, Raytheon Administrator Pat Brown, and Northrop Grumman Director John Larabee.

38.    On or about May 2018, Castro & Co. sent an email to IRS Employee Melanie Godelis explaining their legal position on the tax matter as well as warning her that she was not authorized by 26 U.S.C. § 6103 to share confidential taxpayer information with third-parties at JDFPG.

39.    On June 27, 2018, Castro & Co. emailed IRS Employee Melanie Godelis requesting that she ceases and desist from further contact with Plaintiffs, whom she was meddling in an effort to conceal her unauthorized leaking of confidential taxpayer information.

40.    On or about August 2018, Castro & Co. learned that IRS Employee Melanie Godelis was conspiring with officials at JDFPG to secure, under threat of termination, a "Consent to Disclose" that would have retroactive application in an effort to retroactively cure her unauthorized leaking of confidential taxpayer information to JDFPG officials.

41.    On August 15, 2018, Castro & Co. met with the U.S. Attorney's Office in Washington, D.C., Chief of Fraud and Public Corruption, J.P. Cooney, to make a formal criminal complaint against IRS Employee Melanie Godelis.

42.    On August 24, 2018, representatives of Castro & Co. flew to Alice Springs, Northern Territory, Australia, to put on an International Tax Seminar regarding the treaty positions, Section 911 Foreign Earned Income Exclusion, § 6103 privacy rights, and the validity of the "Consent to Disclose" form that IRS Employee Melanie Godelis had demanded all employees at JDFPG sign.

43.    On or about September 15, 2018, Castro & Co. learned that the U.S. Department of

Justice had made a formal criminal referral to the U.S. Treasury Inspector General for Tax Administration ("TIGTA").

44.    On October 14, 2018, the Internal Revenue Service flew representatives to Alice Springs, Northern Territory, Australia, to host a counter-seminar to reassert their position that the 1966 JDFPG Defense Treaty's tax provisions were still valid despite the comprehensive 1983 U.S.-Australia Income Tax Treaty.  Representatives of the Australian Tax Office ("ATO") were also present; presumably without proper security clearance.

45.    Nevertheless, Castro & Co, began preparing and submitting Amended U.S. Federal Income Tax Returns for several JDFPG employees to properly claim the Section 911 *Foreign Earned Income Exclusion*, which have all been approved to date.[21]

## FACTUAL ALLEGATIONS

46.    Defendants are defense sub-contractors for the United States of America employing a significant number of individuals to work at the Joint Defense Facility Pine Gap (herein "JDFPG") located in Alice Springs, Australia.

47.    Plaintiffs received job offers to work at the JDFPG site and immediately upon acceptance, underwent a rigorous "on-boarding" process that took several months. Over the next several months, Plaintiffs actively pursued the necessary steps to ensure qualification and acceptance for the positions they had been offered. Plaintiffs' efforts included: (i) putting in their notice at their current job that they would be leaving, (ii) undergoing medical and psychological evaluations (Plaintiffs, spouses, and children), (iii) completing written exams, (iv) undergoing counseling, and (v) relocating their U.S. belongings to a storage facility, to provide for their safe-keeping during the

---

[21] During a telephone conversation between John Anthony Castro and IRS Employee Brett Larmour (IRS Employment Identification Number 1000198874) of the IRS Philadelphia Legal Department on November 27, 2018, the IRS representative confirmed that he agreed with the legal interpretation of Castro & Co. and that he would be approving all current and future amended income tax returns.

duration of their employment in Australia.

DEFENDANTS' FRAUDULENT ACTIONS

48.    Either after Plaintiffs' arrival to the JDFPG site or on the eve of their departure, Plaintiffs received from Defendants a "Closing Agreement" that purported to waive their right to certain tax benefits from working overseas (*i.e.*, Internal Revenue Code section 911 exclusion for foreign-earned income) pursuant to an incorrect understanding of the 1966 JDFPG Defense Treaty.

49.    At no time during Plaintiffs' on-boarding process and, for some, at no time prior to their arrival at JDFPG, were Plaintiffs advised that a "Closing Agreement" *might* be necessary; much less that it *would* be mandatory.  This "Closing Agreement" requirement was never reflected in any of the paperwork that had been involved in the entire months-long onboarding process.

50.    Either in addition to or after Plaintiffs received the "Closing Agreement," Plaintiffs received a "Consent to Disclose" form and a "Declaration," which both purported to waive Plaintiffs' *entire* 26 U.S.C. § 6103 taxpayer privacy rights and erroneously stated that the forms were being signed voluntarily. Defendants communicated to Plaintiffs that they *must* sign the "Closing Agreement," "Consent to Disclose" form, and "Declaration" in order to start working in Australia, continue to work in Australia and/or be taxed 45% by the Australian Tax Office.

51.    Defendants have committed fraud and negligent misrepresentation to Plaintiffs by and through the doctrine of vicarious liability in regard to obtaining each signature on the "Closing Agreement", "Consent to Disclose", and "Declaration" forms, attached hereto as Exhibit "A", "B", and "C".

52.    Plaintiff Paxton Allen inquired about the forms to Nancy Donahue, the administrator for the "on-boarding" process at Northrop Grumman. Plaintiff Paxton Allen was told by Nancy that she "thought he already knew" he would not be able to claim certain tax benefits despite the fact that

she, as his primary point of contact throughout the process, had never informed him of that. She also communicated that the "Consent to Disclose" form "did not *actually* mean he would be disclosing his tax returns," which is blatantly false.

53.    Plaintiff Nicole Henaire was given five days to read the forms, consider them, and sign them. Plaintiff Nicole Henaire was told by Defendant Northrop Grumman that this was just a *limited* release, and she had one of two choices: (1) Sign the forms or (2) Begin having Australian taxes taken out on her next paycheck. Plaintiff has an especially high security clearance in which she cannot have a foreign influence over her. Plaintiff Nicole Henaire signed the "Consent to Disclose" form, but stated on the form that she was not signing the form voluntarily, attached hereto as Exhibit "D". Defendant Northrop Grumman made Plaintiff Nicole Henaire sign a new form without her addition to it and repeated that if she did not, she would be taxed the following Monday by Australia. The following day after Plaintiff Nicole signed the form fearing termination or demotion, Defendant Northrop Grumman told her that she was put in for a "Big pay raise and it's a REALLY big deal"; an obvious attempt to buy her silence for fear that she would contact an attorney. To date, Plaintiff Nicole Henaire has yet to be given this "really big pay raise."

54.    Plaintiffs David Dunn, Scott Meredith, and Ramon Baney were told that the forms were *just* for "tax purposes" and that they *had* to sign the forms if they wanted to keep their job at JDFPG.

55.    In fact, Plaintiff Scott Meredith chose to not sign his "Closing Agreement," "Consent to Disclose," and "Declaration," on his second tour at JDFPG, obtained an Australian tax attorney who told him he was not subject to Australian taxes, and never had Australian taxes taken out of his paycheck by Northrop Grumman for not signing these forms.  Nevertheless, he was continually harassed about being sent home for not signing the three agreements and explicitly asked during

one-on-one meetings if he had taken the Section 911(a) tax benefit on his returns.  As a result, Plaintiff Scott Meredith chose to end his tour early and left Australia on August 29, 2018, out of fear of the actions of Northrop Grumman because he did not sign the requested forms.

56.    Plaintiff Ramon Baney made an irrevocable decision to retire from the United States Air Force in order to take employment with TRW, Inc. who later turned into Defendant Northrop Grumman. Upon arrival at JDFPG, Plaintiff Ramon Baney was presented with the "Closing Agreement" that he had no prior knowledge of. Ramon signed the "Closing Agreement" because he had no opportunity to return to the Air Force and had already committed himself to this new employment opportunity. Upon the creation of the new "Consent to Disclose" form, Ramon was told he must sign the "Consent to Disclose" form or else he would be taxed by the Australian Tax Office at the maximum rate of 45 percent.

57.    Plaintiff David Dunn received all three documents at the end of November 2018 with a direction to have all documents signed in two weeks. Plaintiffs were under the impression that based on a memorandum issued by Defendant Northrop Grumman on February 17, 2018, employees had a choice to sign the agreements. However, Plaintiff David Dunn quickly figured out that was not the case and felt cornered and forced to sign the three agreements in order to keep his position with Defendant. In Plaintiff's response to signing all three agreements, Plaintiff issued a "Memorandum for Record," attached hereto as Exhibit "E". On February 4, 2019, Plaintiff received a letter from John Larabee, that stated based on the "Memorandum for Record" they would not be able to accept his signatures on all three agreements and Plaintiff would begin getting taxed at the maximum rate of 45 percent on February 22, 2019, attached hereto as Exhibit "F". In addition, Plaintiff received a second letter labeled, "Final Written Warning" entailing proposed disciplinary action without an explanation of any wrongdoings by Plaintiff David Dunn, attached hereto as

Exhibit "G".

58.     In order to remedy the situation, Plaintiff David Dunn was made to sign a new clean version of the Closing Agreement and Consent to Disclose form without the attached "Memorandum for Record." Plaintiff David Dunn was told that the root of his discipline was due to alleged lack of ethical behavior for "retracting his Closing Agreement and Consent to Disclose" without informing Defendant Northrop Grumman of the true status of the agreements. The level of significance of the alleged behavior rose to the immediate level of a "Last and Final Warning" disciplinary letter. Plaintiff David Dunn has yet to receive any real documentation of the alleged misconduct and unethical behavior after multiple requests from Defendant. Plaintiff David Dunn requested a letter from Defendants rescinding the letter of discipline put in his file for complying with their request of signing new agreements without a "Memorandum for Record." Defendant demanded that Plaintiff David Dunn sign a document waiving legal liability against Defendant as a condition for the letter of rescinded discipline. Defendant now refuses to communicate with Plaintiff in writing and will only speak with Plaintiff over the phone. As a result of Defendant Northrop Grumman's continued harassment and appalling behavior, Plaintiff David Dunn has chosen to leave his position as Ground Terminal and Infrastructure manager with Defendant Northrop Grumman at the JDFPG site.

59.     At the point of receiving the forms from Defendants, Plaintiffs had completely prepared their life for the relocation to Australia, had already arrived in Australia, and felt as though they had no choice but to sign the forms.  Plaintiffs no longer held their current job positions in the United States, had incurred the costs to store away their belongings, and underwent major medical and psychological evaluations and preparation to be overseas. Plaintiffs were placed into a position by Defendants of signing their personal rights away or being told that they will be substantially taxed by the Australian government. Under substantial duress and coercion, Plaintiffs signed the "Closing

Agreement", "Consent to Disclose", and "Declaration" forms.

60.     In late 2018, Plaintiffs became aware that there were pending investigations by the U.S. Department of Justice, U.S. Treasury Inspector General for Tax Administration, and the Department of Defense Inspector General for the unauthorized dissemination and receipt of confidential taxpayer information by IRS Employee Melanie Godelis, DOD "Housing Program Manager" John Turnicky, and JDFPG Chief of Security Jason Long. In spite of the pending investigations, Defendants continue to unlawfully coerce their employees to sign these forms. In addition, Plaintiffs learned of Defendants receiving and inspecting unauthorized tax information for fellow employees. Plaintiffs fear that their legally confidential taxpayer information has also been given to and inspected by Defendants. Plaintiffs fear that this is a reason why they were forced to sign the "Consent to Disclose" form to retroactively justify their illegal receipt and inspection of confidential taxpayer information in an effort to cover-up the wrongdoing by Defendants.

61.     Due to Defendants violations of Plaintiffs' rights, Plaintiffs have initiated this present action. As a result of the harm caused by Defendants, several Plaintiffs and Class Members have elected to prematurely break their employment contracts and find new work and/or move back to the United States on their own volition.

## CLASS ACTION ALLEGATIONS

62.     Plaintiffs bring this class action under Rule 23 of the Federal Rules of Civil Procedure, on their own behalf and others similarly situated. The proposed "Class" is defined as:

> **All persons, regardless of specific employer, who currently or previously worked at the Joint Defense Facility Pine Gap located in Alice Springs, Australia, during the three-year period immediately preceding the filing of this Complaint.**

63.     Upon information and belief, Plaintiffs allege that the Class Members are so numerous that joinder of all is impractical. Plaintiffs believe that the identities and contact

information of Class Members can be readily ascertained from Defendants' records. Plaintiffs believe that there are at least 700 Class Members located in Alice Springs, Australia, making joinder of all Class Members impracticable.

64.    All Class Members, irrespective of their specific employer, are entitled to 26 U.S.C. § 6103 protections.

65.    Plaintiffs' claims are typical of the claims of the other members of the Class. Although the issue of damages may be individual in character, there remains a common nucleus of liability facts. Plaintiffs have actual knowledge that Class Members have also fraudulently been made to sign these forms and that Defendants have received and inspected unauthorized tax information of Class Members. Plaintiffs and the other members of the Class were injured by the same wrongful and unlawful conduct of the Defendants and the relief sought is common to the Class.

66.    Plaintiffs will fairly and adequately protect the interests of the Class. Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether Defendants and their agents unlawfully disseminated or inspected confidential taxpayer information;

b.    Whether Defendants and their agents fraudulently made Plaintiffs and Class Members sign a Closing Agreement, Consent to Disclose form, and Declaration;

c.    Whether Defendants conduct violated federal laws;

d.    Whether the unlawful conduct of Defendants that is alleged herein caused harm or injury to the Plaintiffs and the Class;

e.    The proper measure of damages if Defendants' conduct caused harm to

Plaintiff and the Class; and

            f.     Whether injunctive relief is appropriate to prevent Defendants' continued violations of federal laws.

       67.    A class action is superior to any other available methods for the fair and efficient adjudication of this controversy, since joinder of all Class members' is impracticable and the cost of litigation would far outweigh the likely value of the individual Class members' claims. At the same time, the prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. No difficulty is anticipated in the management of this action as a class action.

## INJUNCTIVE RELIEF

       68.    In addition, Plaintiffs would show that it is appropriate for this court to issue a Temporary Restraining Order under Federal Rules of Civil Procedure 65(a) against Defendants from inappropriately requesting, disseminating, or inspecting confidential taxpayer information protected by 26 U.S.C. § 6103. Further, Plaintiffs would show that it is appropriate for this court to issue a Temporary Restraining order against Defendants to prohibit Defendants to force Plaintiffs and Class Members to sign the "Consent to Disclose" form, which waives all privacy rights to their confidential taxpayer information as a condition to not being taxed at 45 percent by the Australian Government and keeping their employment with Defendants. This Temporary Restraining Order should issue as soon as possible until the Court is able to provide an injunction.

69.     Plaintiffs would show that the requested relief shall prevent irreparable injury, which is imminent as it has been made clear that violations have already occurred. There is no immediate remedy at law that would suffice. Preventing Defendants from inappropriate dissemination and/or inspection of taxpayers' confidential information will not harm the Defendants; indeed, it will simply be proper application of the law. Conversely, the inappropriate dissemination and/or inspection of such information could be damaging to Plaintiffs in their career. Finally, there is no adverse effect on public interest through restraining and ultimately enjoining the inappropriate and, indeed, illegal actions of Defendants.

## COUNT I
### (Civil Damages 26 U.S.C. § 7431)

70.     Plaintiffs incorporates paragraphs 1-69 as if fully set forth herein.

71.     The actions of Defendants have resulted in damages to Plaintiffs and Class Members through disclosure of confidential information and in bringing and pursing this cause of action; Defendants are liable for compensatory damages and costs of this action under § 7431 of the Internal Revenue Code (26 U.S.C. § 7431).

## COUNT II
### (Unauthorized Disclosure/Inspection 26 U.S.C. § 7431)

72.     Plaintiffs incorporates paragraphs 1-69 as if fully set forth herein.

73.     Any dissemination of Plaintiffs' and Class Members' confidential tax information was not affected pursuant to an appropriate grant of authority under 26 U.S.C. § 6103. Even if Defendants claim that the "Consent to Disclose" authorized such disclosure, the "Consent to Disclose" does not meet the requirements of consent under 26 U.S.C. § 6103(c), was not signed voluntarily, was signed under duress and coercion as a result of fraudulent misrepresentation of law and fact, and is legally invalid and unenforceable as a matter of law. Thus, Defendants are liable

for statutory damages under § 7431 of the Internal Revenue Code (26 U.S.C. § 7431). This statute also allows recovery of attorney's fees.

## COUNT III
### (Common Law Fraud)

74.     Plaintiffs incorporates paragraphs 1-69 as if fully set forth herein.

75.     The elements of a common law fraud cause of action are: (1) that a false, material representation was made; (2) that was either known to be false or was made without knowledge of its truth; (that was intended to be acted upon; (4) that was relied upon; and (5) caused injury.[22]

76.     Defendants knew or should have known that they were forcing Plaintiffs to sign forms that waive certain tax benefits without proper notice and under duress and coercion. Defendants knew or should have known that Plaintiffs were not signing a *limited* release of their taxpayer rights, but were being made to sign a form that consented to the disclosure of their *entire* personal taxpayer information. Defendants knew or should have known that they were forcing Plaintiffs to sign forms that incorrectly state that Plaintiffs were voluntarily signing. Defendants knew or should have known that they were coercing Plaintiffs to sign these forms as an ultimatum of keeping their employment after not properly giving Plaintiffs notice, time to make an informed decision, or consult with legal representation of their own. Defendants fraudulently offered employment contracts to Plaintiffs without disclosing key information about their requirements in order to gain employment until it was too late for Plaintiffs.

## COUNT IV
### (Temporary Restraining Order and Preliminary Injunction FRCP 65)

77.     Plaintiffs reasserts paragraphs 1-69 as if fully set forth herein.

78.     Plaintiffs have alleged facts sufficient to support the grant of a Temporary

---

[22] *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998).

Restraining Order and Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and hereby request such Temporary Restraining Order and Preliminary Injunction issue against Defendants.

## DAMAGES

79.     As a direct and/or proximate result of Defendants' wrongful conduct, Plaintiffs and Class Members have suffered actual, consequential, and/or incidental damages. Plaintiffs and Class Members seek actual and compensatory damages to the full extent allowed by law as established in 26 U.S.C. § 7431.

80.     Plaintiffs and Class Members seek recovery of the full costs of this action as contemplated under 26 U.S.C. § 7431.

81.     Plaintiffs and Class Members seek recovery of attorney's fees incurred in bringing and pursuing this action as contemplated in 26 U.S.C. § 7431.

82.     Plaintiffs and Class Members seek the immediate issuance of a Temporary Restraining Order to be followed by a Preliminary Injunction preventing Defendants from any further dissemination and/or inspection of confidential tax information, and from further attempts to "force" Plaintiffs to inappropriately sign away rights.

## PRAYER

WHEREFORE, with respect to Counts I-III, Plaintiffs respectfully pray that an order be entered:

a.     Certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Classes;

b.     Entering judgment in favor of Plaintiffs and the Class and against Defendants for statutory damages pursuant to 26 U.S.C. § 7431;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendants for actual damages pursuant to 26 U.S.C. § 7431;

d.    Awarding injunctive relief under Rule 65 of the Federal Rules of Civil Procedure;

e.    Awarding costs and reasonable attorney's fees pursuant to 26 U.S.C. § 7431; and

f.    Granting such other and further relief as may be just and proper.


Respectfully submitted,


Dated: February 26, 2019

*Kathryn Magan*

KATHRYN MAGAN
Texas Bar No. 24107854
**CASTRO & CO., LLC**
K.Magan@CastroAndCo.com
13155 Noel Road, Suite 900
 Dallas, TX 75240
Tel. (469) 550-0036
Fax: (866) 700-7595
**ATTORNEY FOR PLAINTIFFS**